**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS C. VAN METER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 3013** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Sheila Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Thomas C. Van Meter seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. On April 26, 2010, the case was reassigned to this Court for all further proceedings. After careful review of the record, the Court now denies Plaintiff's motion and grants the Commissioner's motion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 6, 2005, alleging that he became disabled on May 13, 2005 from irritable bowel syndrome ("IBS") and a torn left rotator cuff. (R. 69, 90, 93-94.) The Social Security Administration ("SSA") denied the application initially on February 27, 2006, and again on reconsideration on June 29, 2006. (R. 49-55, 57-61.) Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Janice M. Bruning held an administrative hearing on October 3, 2007. The ALJ heard testimony from Plaintiff, who

appeared with counsel, and from vocational expert ("VE") James Breen. A little less than two months later, on November 19, 2007, the ALJ found that Plaintiff is capable of performing his past relevant bricklayer work "as actually performed," as well as a significant number of other medium jobs available in the national economy. (R. 11-17.) The Appeals Council denied Plaintiff's request for review on March 25, 2009, and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. (R. 1-4.)

In support of his request for reversal and remand, Plaintiff argues that the ALJ (1) erred in weighing the medical opinions of his treating physician, Dr. Sunil Joseph, (2) improperly relied on flawed VE testimony, (3) failed to properly assess his credibility, and (4) erred in finding that his work for Northwest Masonry in 2006 constituted substantial gainful activity ("SGA"). For reasons discussed below, the Court rejects these arguments.

## **FACTUAL BACKGROUND**[1]

Plaintiff was born on July 7, 1947, and was 60 years old at the time of the ALJ's decision. (R. 69.) He completed high school and one year of college before serving a full apprenticeship to become a bricklayer. (R. 31.) Plaintiff worked as a brick mason for the State of Illinois from January 1988 to January 1997. He also worked as a bricklayer for his friend Val Thompson of Northwest Masonry, Inc. from 1987 to 1993 or 1994. (R. 94, 147.) In May 1998, Plaintiff was assigned to work as a light duty brick mason at the State of

---

[1]     In his sole brief in support of summary judgment, Plaintiff challenges the ALJ's findings only with respect to his IBS. The Court thus limits its factual recitation and subsequent legal analysis to evidence involving that impairment. *See Bollas v. Astrue*, 694 F. Supp. 2d 978, 990 (N.D. Ill. 2010) ("Issues not raised in a claimant's initial brief are generally waived for purposes of review.")

Illinois Elgin Mental Health Center. He continued working there until May 13, 2005, when his position was eliminated. (R. 70, 94, 107.) Despite claiming that he was unable to work as of that date, Plaintiff collected six months of unemployment insurance after the layoff, then spent four weeks working for Illinois Masonry Corporation in 2006. (R. 13, 84, 88.) On June 12, 2006, Plaintiff started a part-time maintenance bricklayer job with Mr. Thompson's company, earning nearly $15,500 for six months of work through December 15, 2006. That job ended due to a lack of work in the housing/construction industry, and Plaintiff collected another six months of unemployment benefits from January to July 2007. (R. 33.)

## A.    Medical History

### 1.    1998 through 2001

Plaintiff was first diagnosed with possible IBS in November 1998 when he saw Dr. Michael J. Colligan at Elgin Gastroenterology due to a six-month history of lower abdominal pain. Plaintiff complained of an intermittent, sharp and cramping sensation associated with some rectal urgency, and reported one isolated episode of bright red rectal bleeding. He described having two or three formed stools every morning, compared with a history of only one bowel movement per day. (R. 189.) At that time, Plaintiff was taking two FiberCon pills and a Zantac each day, and he complained of gastroesophageal reflux. Dr. Colligan noted that a recent CT scan of Plaintiff's abdomen was normal, and diagnosed "[c]hronic lower abdominal pain, change in bowel pattern, and rectal bleeding - etiology undetermined." (*Id.*) Dr. Colligan scheduled Plaintiff for a colonoscopy and stated that if the results were negative, he would treat Plaintiff for IBS by "intensifying acid suppression and adding antispasmodic to the FiberCon." (R. 190.)

The record does not contain the 1998 colonoscopy report, but Dr. Colligan noted in January 2002 that the test had showed non-specific colitis and diverticulosis, with no evidence of inflammatory bowel disease. (R. 187.) Plaintiff was not placed on any treatment at that time, and he did not see Dr. Colligan again until November 26, 2001, when he returned complaining of chest pain and dysphagia (difficulty swallowing). Dr. Colligan noted a history of gastroesophageal reflux disease ("GERD") and difficulty taking Prevacid due to side effects. (R. 187, 190.) He diagnosed GERD-induced esophageal spasm and prescribed AcipHex. (R. 190.)

## 2.    2002

On January 7, 2002, Plaintiff saw Dr. Colligan for a follow-up on his GERD symptoms. Both Plaintiff's dysphagia and chest pain had resolved on the AcipHex, and Dr. Colligan referred him for an esophagogastroduodenoscopy ("EGD") to screen for Barrett's esophagus[2] and reflux esophagitis. (R. 187.) The record does not contain the EGD report, which according to Dr. Colligan's notes occurred in either February or April 2002. In any event, Dr. Colligan noted that the test revealed a non-obstructing Schatzki's ring,[3] hiatal hernia, hyperplastic gastric polyp, and duodenitis (inflammation of the first part of the small intestine). (R. 185, 186.) When Plaintiff saw Dr. Colligan on July 10, 2002, he continued

---

[2]    "Barrett's esophagus" is "a condition in which the color and composition of the cells lining [the] lower esophagus change, usually because of repeated exposure to stomach acid." The condition is "most often diagnosed in people who have long-term [GERD]." (http://www.mayoclinic.com/health/barretts-esophagus/HQ00312, last visited on 12/7/10).

[3]    A "Schatzki's ring" is "an abnormal ring of tissue that forms where the esophagus (the tube from the mouth to the stomach) and stomach meet." (http://www.nlm.nih.gov/medlineplus/ency/article/000208.htm, last visited on 12/7/10).

to do well on the AcipHex and FiberCon.  Dr. Colligan diagnosed GERD, non-obstructing Schatzki's ring, and non-specific left-sided colitis, and advised Plaintiff to add a trial of Probiotica to his daily medication regimen.  Dr. Colligan told Plaintiff to follow-up with him in one year.  (R. 186.)

### 3.    2003 through 2004

At his annual visit with Dr. Colligan on August 27, 2003, Plaintiff's GERD symptoms were under excellent control with AcipHex, and his chronic diarrhea was controlled well with Imodium.  He was still having two to three bowel movements per day and occasional nocturnal stools and urgency due to his IBS, but he denied any bleeding.  Dr. Colligan refilled Plaintiff's prescriptions and instructed him to follow up again in one year.  (R. 185.) At that July 7, 2004 check-up, Plaintiff was still doing well with his medications.  (R. 184.) A few months later, however, Plaintiff went to Dr. Colligan complaining of a change in bowel pattern manifested by nightly episodes of being awakened by lower abdominal cramping associated with passage of several stools.  Dr. Colligan diagnosed an acute episode of left-sided non-specific colitis and discussed the possibility of another colonoscopy if Plaintiff's symptoms did not improve.  (R. 183-84.)  He instructed Plaintiff to continue taking AcipHex and Loperamide, and to start taking Librax for his symptoms.  (R. 183.)

**4.     2005**

By December 14, 2004, Plaintiff was not feeling better, so he scheduled a colonoscopy for January 17, 2005. (*Id.*)  The test showed mild diverticulosis and internal hemorrhoids but was otherwise normal.  (R. 180-82.)  Dr. Colligan stated that the cause of Plaintiff's episodic urgency and diarrhea was "not totally explained," but he assumed, based on the negative screening results, that the symptoms were caused by IBS/diverticulosis, and he continued treating Plaintiff accordingly.  (R. 179.)

More than five months later, on July 6, 2005, Plaintiff started seeing Dr. Sunil Joseph at Elgin Gastroenterology for his IBS.  Plaintiff told Dr. Joseph that when he had an episode of bilateral lower quadrant pain followed by loose, smaller bowel movements, he needed to be very close to a bathroom to prevent an accident, something his previous job with the State of Illinois had allowed.  His new job, however, "caused some difficulty with his symptoms."[4]  Dr. Joseph noted that Plaintiff's symptoms appeared stable at that time, and instructed him to continue taking Imodium and Librax and return in one year.  (R. 178.)

On August 1, 2005, Dr. Joseph sent Plaintiff's attorney a narrative report summarizing Plaintiff's condition and treatment.  After describing the contents of the treatment notes, Dr. Joseph stated that Plaintiff's IBS symptoms were stable, with his main complaint being intermittent episodes of lower abdominal cramping and diarrhea.  Those symptoms, however, were well-controlled with Imodium and Librax.  According to Dr. Joseph, the symptoms "may be limiting in the patient in that he needs close proximity to a

---

[4]     It is not clear from the record where Plaintiff was working as of July 2005.  As noted, his positions with Masonry Corporation and Northwest Masonry, Inc. both started in 2006.  (R. 13, 88, 147.)

bathroom during an acute episode of his symptomatology," but "[t]here are no other physical limitations on a regular basis aside [from] during his acute episodes." (R. 177.)

On September 13, 2005, Plaintiff saw Dr. Gregory T. Winters of the Winters Family Practice for evaluation of an abdominal hernia. Plaintiff denied experiencing any pain, discomfort, nausea, vomiting or diarrhea at that time, but Dr. Winters referred him for a surgical consultation. (R. 221.) Dr. George Bardouniotis examined Plaintiff on September 27, 2005, and reported to Dr. Winters that Plaintiff's rectus diastasis did not require repair and that he did not have a true hernia. Dr. Bardouniotis stated that Plaintiff "may have a small umbilical hernia" and should return for re-examination if it should ever grow or bother him.[5] (R. 230.)

Two days later, on September 29, 2005, Dr. Joseph completed a Gastrointestinal Disorders Impairment Questionnaire for Plaintiff's attorney. (R. 152-57.) Dr. Joseph confirmed Plaintiff's diagnosis of IBS with intermittent lower abdominal pain and cramps followed by diarrhea. (R. 152-53.) He opined that Plaintiff's symptoms would seldom be severe enough to interfere with attention and concentration, and that he is capable of moderate stress. In Dr. Joseph's view, Plaintiff can sit for eight hours and stand for two hours in an eight-hour workday, and he can occasionally lift and carry over 50 pounds. (R. 155-56.) Dr. Joseph checked a box estimating that Plaintiff would likely miss work "[a]bout two to three times a month," but he made clear that Plaintiff's "only real impairment is he needs close proximity to [a] bathroom when he has [an] attack of IBS." (R. 156.) Dr. Joseph further explained that Plaintiff would have 5 to 10 minutes advance notice of his

---

[5]     There is no evidence that Plaintiff saw Dr. Bardouniotis for any further treatment.

need for a restroom break, and he would need to be away from his work space for 15 minutes.  (R. 157.)

### 5.    2006 through 2007

Several months later, on January 20, 2006, Dr. Joseph completed a Gastrointestinal Report on Plaintiff for the Bureau of Disability Determination Services ("DDS").  Dr. Joseph again confirmed Plaintiff's diagnosis of IBS, along with diverticulosis and internal hemorrhoids, and he described symptoms of recurrent abdominal pain relieved by bowel movements.  Dr. Joseph reiterated that Plaintiff is limited in working if he has no ready access to a bathroom, but that he otherwise has no true physical limitations.  (R. 150-51.)

On January 31, 2006, Dr. Roopa K. Karri conducted an Internal Medicine Consultative Examination of Plaintiff for DDS.  (R. 158-61.)  Plaintiff told Dr. Karri that he had been able to work despite his eight-year history of IBS, but that he was laid off the previous year and was having difficulty finding a job.  He complained of a lot of bloating, gas and diarrhea about eight times in two hours, or one to two times per day.  In addition, Plaintiff stated that he has occasional accidents with his bowel movements and needs to be near a bathroom all the time.  He reported, however, that his left shoulder rotator cuff was "better now," and that his GERD was controlled with AcipHex.  (R. 159.)  Dr. Karri diagnosed: (1) a history of left shoulder rotator cuff tear, status post surgery, "better now"; (2) a history of IBS with diarrhea and bowel urgency; and (3) GERD, better with AcipHex. (R. 161.)

The following month, on February 16, 2006, Dr. Ernst Bone completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (R. 162-69.)  Dr. Bone found that Plaintiff can occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds,

stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an eight-hour workday. (R. 163.) Plaintiff can also engage in frequent climbing of ramps/stairs, balancing, stooping, kneeling, crouching and crawling. (R. 164.) Dr. Bone stated that Plaintiff has no manipulative, communicative or environmental limitations, though his vision is impaired enough to require glasses. (R. 165-66.)

Shortly thereafter, on February 21, 2006, Terry McConnell completed a Vocational Assessment of Plaintiff for DDS. Mr. McConnell stated that based on Dr. Bone's conclusion that Plaintiff is limited to performing medium work, he cannot perform any past relevant work because it was more than medium in nature. Plaintiff's skills would not transfer to related jobs, but there remains a "sufficient number of jobs within the unskilled, occupational base" which Plaintiff can perform. By way of example, Mr. McConnell identified positions such as a rotary drier feeder, a molder of wax balls, and an order runner. (R. 112.)

On April 13, 2006, Plaintiff returned to Dr. Joseph for another annual examination. Plaintiff told Dr. Joseph that he experienced intermittent bouts of diarrhea and bilateral lower abdominal cramping at least three days per week, symptoms Dr. Joseph described as chronic but stable. Dr. Joseph stated that he would be happy to write a letter describing Plaintiff's symptoms to the SSA, but that he "cannot write a letter stating that he cannot work." Dr. Joseph explained that "[m]any people suffer from [IBS] and work on a daily basis," and suggested that Plaintiff "may need to change his occupation to deal with his symptomatology." To ensure that he had not missed any etiologies, however, Dr. Joseph ordered serologic studies and repeat stool studies to rule out bacterial overgrowth and

Crohn's disease. (R. 176, 195, 236.) Plaintiff's stool sample tested normal, as did an x-ray of Plaintiff's small bowel. (R. 171-75.)

More than a year later, in May 2007, Plaintiff told Dr. Winters that his GERD was under control with AcipHex. (R. 225.) On July 20, 2007, Plaintiff saw Dr. Joseph for his annual examination and reported that he was only having episodes of diarrhea and abdominal cramping "one time every other week or so." Dr. Joseph concluded that Plaintiff's IBS remained stable at that time, suggested that he try switching from AcipHex to Prilosec, and instructed Plaintiff to once again follow-up with him in one year. (R. 194.)

## B.    Plaintiff's Testimony

At the October 3, 2007 hearing, Plaintiff testified that he stopped working for the State of Illinois in May 2005 because his job "was terminated." (R. 36.) His friend Val Thompson offered him a part-time job beginning in June 2006, but that work ended in mid-December 2006 when the housing industry failed. (R. 37.) Plaintiff testified that he does not think he could have worked for his friend full-time because the work wore him out and put strain on his back. (R. 43.) In any event, Plaintiff received unemployment insurance after the 2005 layoff, and again from January to July 2007 when his friend no longer had work for him. (R. 33.)

Plaintiff testified that his only medical problem is that he needs to use the bathroom four to six times a day, mostly before noon. He has no trouble walking or sitting, and thinks he can stand for about an hour at a time. (R. 37.) In that regard, Plaintiff does some cooking and laundry, drives a couple hundred miles a week, goes grocery shopping, gardens, socializes with family and friends, goes out to eat, reads, watches television and movies, cares for his dog, and pays the bills. (R. 39-41.) On a typical day, Plaintiff reads

10

the paper and then tries to figure out what he wants to do. He "might go to the store . . . just to walk around," or he might just watch television. (R. 41.)

## C.    Vocational Expert Testimony

Mr. Breen testified at the hearing as a VE. He characterized Plaintiff's past relevant maintenance bricklayer work as medium to heavy with no transferrable skills. (R. 44-45.) The ALJ described a hypothetical individual of Plaintiff's age, education and work experience who: can perform medium work; occasionally climb ladders, ropes or scaffolding; frequently climb ramps and stairs; and balance, stoop, crouch, kneel and crawl. The VE testified that such an individual could not perform Plaintiff's past relevant work as described in the Dictionary of Occupational Titles ("DOT"), but that he could perform the maintenance bricklayer job as Plaintiff actually performed it. (R. 45.) The individual could also perform other unskilled, medium jobs available in the region, including janitor (82,000 jobs), warehouse worker (about 62,000 jobs), and hydraulic press operator (about 32,000 jobs). (*Id.*)

The ALJ asked the VE to consider an individual who also needs ready access to a bathroom, such that he would "probably have to be indoors." The VE confirmed that all of the jobs except maintenance bricklayer would be indoors. (R. 45, 47.) The VE also testified that the customary tolerance for absences is 10 to 12 days a year. If an individual needed to be absent from work two or three days per month, then he would not be able to work. (R. 47-48.)

**D.     The ALJ's Decision**

The ALJ first found that Plaintiff had engaged in SGA after the alleged onset date of May 13, 2005.  Specifically, Plaintiff worked for his friend Mr. Thompson at Northwest Masonry for six months in 2006, earning almost $15,500.  The ALJ noted that Plaintiff stopped working in December 2006 "due to a slump in [the] new housing/construction industry, and not because of medical reasons."  She also observed that Plaintiff collected unemployment compensation after his layoff in 2005 and again after he stopped working for Mr. Thompson in 2007.  (R. 13.)  The ALJ acknowledged that Mr. Thompson submitted a letter to Plaintiff's lawyer on May 14, 2007 stating that he "knew [Plaintiff] no longer could do the block work or heavy lifting, or the grouting that most of the industry does," and that Plaintiff "can't do the work required of a normal working bricklayer."  (R. 147.)  The ALJ declined to give the letter any weight, however, because Mr. Thompson is Plaintiff's friend and not a VE, and because he confirmed that he let Plaintiff go because there was no work available, and not for medical reasons.  (R. 16.)

The ALJ next concluded that Plaintiff's IBS and "right knee internal derangement and surgery" are severe impairments, but that he does not have an impairment or combination of impairments that meets or medically equals those listed in the Social Security Regulations.  (R. 13-14.)  The ALJ determined that Plaintiff has the RFC to perform medium work, except that he can only occasionally climb ladders, ropes and scaffolds, and he requires ready access to a bathroom.  (R. 14.)

In reaching this conclusion, the ALJ considered the objective medical record, including Dr. Joseph's July 2005, April 2006 and July 2007 opinions that Plaintiff's IBS is chronic but stable.  The ALJ found it significant that Dr. Joseph declined to write a letter

12

stating that Plaintiff cannot work merely because he needs easy access to a bathroom.  (R. 15, 16.)  She gave no significant weight, however, to Dr. Joseph's opinion that Plaintiff can only lift and/or carry up to 20 pounds, noting that "it is unclear why lifting limitations were given if the claimant's only problem is [IBS] and need to be near a bathroom."  (R. 16.) With respect to Dr. Joseph's August 1, 2005 and January 20, 2006 assessments, the ALJ gave them some but not controlling weight.  Dr. Joseph had only seen Plaintiff one time when he prepared the August 2005 letter for Plaintiff's attorney, and both records reflect that the main issue was access to a bathroom, which "is not considered to be disabling." (R. 17.)

The ALJ reviewed Plaintiff's statements regarding his symptoms and inability to work, but did not find them persuasive.  The ALJ noted that Plaintiff lost his job in May 2005 due to a layoff and not for medical reasons, and he collected unemployment insurance by certifying that he was able to work.  Plaintiff also worked for at least another six months in 2006 before collecting unemployment insurance again in 2007.  (R. 15.)  The ALJ found that Plaintiff's extensive daily activities, including shopping, driving, doing laundry, gardening, taking out the garbage, caring for himself, eating out, watching movies, reading and handling finances, further undermine his claim of disabling limitations.  (R. 16.)

The ALJ determined that Plaintiff is capable of performing his past work as a maintenance bricklayer as he performed it at the medium exertional level.  The ALJ also accepted the VE's testimony that there are a significant number of additional jobs Plaintiff can perform, including janitor, warehouse worker and hydraulic press operator, all of which are indoors and would provide access to a bathroom.  (R. 17.)

## <u>DISCUSSION</u>

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007) (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)).

### B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that he is disabled within the meaning of the Act. 42 U.S.C. § 423(d); *Crawford v. Astrue*,

14

633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). A person is disabled if he is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Id.*; *Strocchia v. Astrue*, No. 08 C 2017, 2009 WL 2992549, at *14 (N.D. Ill. Sept. 16, 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C. Analysis

Plaintiff argues that the ALJ erred in weighing Dr. Joseph's medical opinions, improperly relied on flawed VE testimony, and failed to properly assess his credibility. Plaintiff also claims in a footnote that the ALJ erred in finding that his work for Northwest Masonry in 2006 constituted SGA. The Court considers each argument in turn.

### 1. Treating Physician Rule

Plaintiff objects that the ALJ assigned improper weight to Dr. Joseph's medical opinions as set forth in the September 2005 Gastrointestinal Disorders Impairment Questionnaire (the "Questionnaire"), and in the April 13, 2006 and July 20, 2007 treatment notes. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent

with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006). If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including: the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist. 20 C.F.R. § 404.1527(d)(2)-(5).

### a. The Questionnaire

Plaintiff first argues that the ALJ erred in giving no significant weight to the Questionnaire. In that document, Dr. Joseph stated that: Plaintiff's symptoms would seldom be severe enough to interfere with attention and concentration; he is capable of moderate stress; he can sit for eight hours and stand for two hours in a "normal competitive five day a week work environment on a sustained basis"; and he can frequently lift and carry 20 pounds. (R. 155-56.) Dr. Joseph checked a box estimating that Plaintiff would likely miss work "[a]bout two to three times a month," and he noted that Plaintiff would have 5 to 10 minutes advance notice of his need for a 15-minute restroom break. (R. 156-57.)

In discussing the Questionnaire, the ALJ found no basis for the 20-pound lifting restriction because it is unrelated to IBS or the need to be near a bathroom. (R. 16.) Plaintiff claims that this evaluation is inadequate because the ALJ failed to mention his absences from work and the amount of time he needs to be away from his workstation during an IBS attack. The Court disagrees. Dr. Joseph did check the box regarding Plaintiff's absences, but he handwrote a note on the same page making clear that Plaintiff's "only real impairment is he needs close proximity to [a] bathroom when he has [an] attack

of IBS." (R. 156.) Dr. Joseph repeated his opinion that Plaintiff has no physical limitations other than needing access to a bathroom in his August 1, 2005 report to Plaintiff's attorney, in his January 20, 2006 Gastrointestinal Report for DDS, and in his April 13, 2006 treatment note. (R. 150-51, 176, 177.) Significantly, the ALJ accepted the bathroom limitation and expressly incorporated it into Plaintiff's RFC.

Contrary to Plaintiff's suggestion, there is nothing in his medical record to indicate that he would need to miss two or three days of work each month. Plaintiff saw Dr. Joseph only three times between July 6, 2005 and July 20, 2007, and only for scheduled annual examinations. On each occasion, Dr. Joseph observed that Plaintiff's IBS symptoms are chronic but stable, and well-controlled with medication. (R. 176, 177, 194.) In his detailed treatment notes, Dr. Joseph never indicated that Plaintiff's symptoms would prevent him from leaving home or going to work, and instead opined that he is capable of employment. Plaintiff himself testified that he is able to engage in a wide variety of activities, including shopping, driving, doing laundry, gardening, taking out the garbage, caring for himself, eating out, watching movies, reading, handling finances, and socializing with family and friends. Moreover, the record shows that Plaintiff never lost a job for medical reasons.

As for Dr. Joseph's handwritten notation that Plaintiff would have 5 to 10 minutes notice of his need for a 15-minute bathroom break, Plaintiff is correct that the ALJ did not expressly mention this assessment. However, "the ALJ is not required to discuss every piece of evidence but is instead required to build a logical bridge from the evidence to her conclusions." *Simila*, 573 F.3d at 516. Here, Dr. Joseph made his timing estimates after seeing Plaintiff only one time, and none of his detailed treatment notes ever included such limitations. Regardless, the fact that Plaintiff has advance notice of his need for an

impending bowel movement, as well as time to make it to a restroom, fairly supports the ALJ's conclusion that Plaintiff is capable of working.

### b. The April 13, 2006 Treatment Note

Plaintiff next claims that Dr. Joseph's April 13, 2006 treatment note, in which he declined to write a letter stating that Plaintiff cannot work, is not entitled to controlling weight. Plaintiff observes that under the Social Security Regulations, "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. § 404.1527(e)(1). He stresses that the Commissioner, and not a treating physician, must decide whether an individual is capable of working, and then claims that, in accordance with this regulation, Dr. Joseph gave no "vocational opinion about whether [Plaintiff] could perform other work." (Doc. 17, at 9.) This is inaccurate.

Dr. Joseph affirmatively rejected Plaintiff's request for a letter stating that he is unable to work, explaining that many people suffer from IBS yet work on a daily basis, and that Plaintiff can change jobs if necessary to deal with his symptomatology. (R. 176.) Far from making a bald assertion that Plaintiff is not disabled, Dr. Joseph consistently explained the nature of Plaintiff's symptoms and concluded that he is capable of working as long as he has access to a bathroom. This opinion is supported by all of the medical evidence of record and, thus, is entitled to controlling weight. *See Wescott v. Astrue*, No. 4:08-CV-36, 2009 WL 3739427, at *7 (N.D. Ind. Nov. 5, 2009) (treating physician's opinion that claimant's symptoms were under good control and that she could return to work was entitled to controlling weight).

18

### c. The July 20, 2007 Treatment Note

Plaintiff finally suggests that the ALJ should have contacted Dr. Joseph to reconcile his July 20, 2007 treatment note stating that Plaintiff only has episodes of diarrhea and abdominal cramping "one time every other week or so," with Plaintiff's October 2007 testimony that he experiences four or five bowel movements in an hour. (Doc. 17, at 9.) In Plaintiff's view, the ALJ failed to fulfill her duty of developing a full and fair record. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The Court disagrees.

It is well-established that "the claimant is responsible for providing medical evidence of his disability." *Caine v. Astrue*, No. 08 C 50103, 2010 WL 4627718, at *13 (N.D. Ill. Nov. 3, 2010) (citing *Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991)). Plaintiff was at all times represented by counsel, but he never suggested that the ALJ needed to contact Dr. Joseph or obtain additional information. *See Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1031 (N.D. Ill. 2009) (quoting *Ray v. Bowen*, 843 F.2d 998, 1006 (7th Cir. 1988)) ("Where, as here, an applicant for disability benefits is represented by counsel, the ALJ is 'entitled to assume that the applicant is making [his] strongest case for benefits.'")

Moreover, while "ALJs may contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability," they are not required to do so. *Skinner*, 478 F.3d at 843. Here, all of Dr. Joseph's treatment notes reflect that Plaintiff's IBS symptoms are chronic and stable, and that he can manage those symptoms with ready access to a bathroom. The ALJ reasonably concluded that she had adequate information to determine that Plaintiff is not disabled.

Plaintiff contends that even assuming his condition improved in July 2007, the ALJ should have considered whether he is entitled to a closed period of disability. There is no

evidence, however, that Plaintiff has been under a disability for any period of at least 12 months between the alleged onset date and the date of the ALJ's decision. *See* 20 C.F.R. § 404.320(b) (setting forth "[w]ho is entitled . . . to a period of disability."); *Sanchez v. Astrue*, No. 2:07-CV-428 JVB, 2009 WL 2413792, at *9 (N.D. Ind. Aug. 4, 2009) (ALJ did not err in failing to consider a closed period of disability where there was no evidence that the claimant was disabled at any time after the alleged onset date). To the contrary, the medical evidence demonstrates that Plaintiff's IBS was at all times stable and controlled with medication, and that he only needed to see Dr. Joseph on an annual basis for routine check-ups.

For all the reasons set forth above, the ALJ's evaluation of Dr. Joseph's opinions is supported by substantial evidence.

### 2. VE Testimony

Plaintiff argues that the case must nonetheless be remanded because the ALJ relied on flawed VE testimony. Defendant concedes that the ALJ erred in finding Plaintiff capable of performing his past work as a maintenance bricklayer because that job would likely be outdoors, and Plaintiff needs ready access to a bathroom. (Doc. 24-4, at 6.) Defendant insists that this error was harmless, however, because the ALJ also found that Plaintiff can perform a significant number of other jobs, including janitor, warehouse worker and hydraulic press operator. *See Spiva v. Astrue*, ___ F.3d ___, 2010 WL 4923563, at *6 (7th Cir. 2010) ("The doctrine of harmless error indeed is applicable to judicial review of administrative decisions."); *Scott v. Astrue*, ___ F. Supp. 2d ___, 2010 WL 3034668, at *18 (C.D. Ill. July 30, 2010) ("Harmless errors are those that do not affect an ALJ's determination that a claimant is not entitled to benefits.") (internal quotations omitted).

Plaintiff disagrees, arguing that the VE did not explain how he interpreted the requirement that Plaintiff have ready access to a bathroom "in terms of the frequency and length of time he would spend in the restroom." (Doc. 17, at 10.) The primary evidence in that regard was from Dr. Joseph, who stated in the September 2005 Questionnaire that Plaintiff would have 5 to 10 minutes notice of his need for a 15-minute bathroom break. The ALJ did not mention this information in her hypothetical question, but she did confirm that the VE had reviewed the exhibits in the record, which included the Questionnaire. (R. 44.) In addition, the VE heard Plaintiff testify that he "could have . . . four or five bowel movements in an hour." (R. 36.) This supports a finding that the VE was familiar with all of Plaintiff's symptoms and limitations when he identified available jobs. *See O'Connor-Spinner v. Astrue*, __ F.3d __, 2010 WL 4812819, at *4 (7th Cir. 2010) ("We sometimes have assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations.")

Notably, Plaintiff's attorney did not ask the VE any questions about bathroom breaks, much less about employer tolerances in that regard. Instead, Plaintiff's attorney asked the VE about employer tolerances for absences, but as explained earlier, the ALJ fairly discounted Dr. Joseph's notation that Plaintiff would miss two to three days of work each month. (R. 47.) *Simila*, 573 F.3d at 521 (quoting *Schmidt*, 496 F.3d at 846) ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible.")

On the facts presented, the Court finds substantial evidence to support the ALJ's conclusion that Plaintiff is capable of performing a significant number of jobs available in the economy, as identified by the VE.

### 3. Plaintiff's Credibility

In another effort to secure a reversal and remand, Plaintiff argues that the ALJ erred in finding that his testimony regarding his symptoms and limitations was not entirely credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Simila*, 573 F.3d at 517; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

The ALJ discounted Plaintiff's statements regarding his symptoms and limitations because: he lost his job with the State of Illinois due to a layoff and not for medical reasons; that job allowed him access to a bathroom by virtue of being indoors; and he collected unemployment benefits, then worked for another six months before collecting more unemployment benefits. (R. 15.) Plaintiff ignores the State of Illinois job and the May 13, 2005 layoff, focusing instead on the work he performed for Val Thompson at Northwest

22

Masonry in 2006. Plaintiff claims that he was receiving special accommodations from his friend, and that he lost the job because Mr. Thompson "could no longer employ someone with such limited work abilities." (Doc. 17, at 12.) The record does not support Plaintiff's assertion.

First, the ALJ reasonably rejected the contents of Mr. Thompson's May 14, 2007 letter, including his statement that Plaintiff "can't do the work required of a normal working bricklayer." (R. 147.) Mr. Thompson is Plaintiff's friend, and not a VE qualified to provide vocational opinions. (R. 16.) In addition, though Plaintiff worked for Mr. Thompson only part-time, the reduced schedule had nothing to do with Plaintiff's IBS or his need for access to a bathroom. To the contrary, Plaintiff testified that he does not think he could have worked for Mr. Thompson full-time because the work wore him out and put strain on his back and arms. (R. 43.) Significantly, Plaintiff has not identified a single accommodation that Mr. Thompson purportedly made for his IBS. As for the fact that Plaintiff ultimately left that part-time job, he testified that "the housing industry started going down and [Mr. Thompson] ran out of work and . . . [he] was asked not to come back." (R. 37.) This in no way demonstrates that Plaintiff's IBS is so limiting that he is unable to work.

The Court is similarly unpersuaded that the ALJ erred by discussing Plaintiff's unemployment earnings. The Seventh Circuit has stated that "a Social Security claimant's decision to apply for unemployment benefits and represent to state authorities and prospective employers that he is able and willing to work" is a factor to consider in assessing a claimant's credibility. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Here, Plaintiff applied for and received unemployment benefits on two separate occasions after the alleged disability onset date. There is no evidence that Plaintiff was forced to seek

employment due to "desperate financial straits, or that he did so out of a misapprehension of his own condition." *Id.* As noted, Plaintiff only left his Northwest Masonry job in 2006 because of a housing slump.

Plaintiff finally attempts to bolster his credibility by stressing his "long and successful work history." (Doc. 17, at 12.) As Plaintiff acknowledges, however, the Seventh Circuit has noted that a claimant "is not entitled to a presumption of credibility based solely on his long work history." *Jones v. Apfel*, 234 F.3d 1273 (Table), at *2 (7th Cir. 2000). *Cf. Simila*, 573 F.3d at 520 (ALJ properly found that the claimant's poor work history prior to the alleged disability onset date showed a lack of effort to find work and diminished his credibility). Moreover, Plaintiff's work history includes six months of employment performed while he was allegedly disabled. The ALJ's credibility determination in this case is not patently wrong and does not warrant a reversal or remand.

### 4. SGA

In a footnote, Plaintiff claims that the ALJ erred in concluding that his work for Mr. Thompson constituted SGA. To determine whether work is SGA, an ALJ considers (1) the amount of the claimant's earnings for the relevant period, and (2) whether the claimant performed work activity in a special or sheltered environment. 20 C.F.R. § 404.1574(a); *Stepanski v. Astrue*, No. 08-CV-430-BBC, 2009 WL 602013, at *4 (W.D. Wis. Mar. 9, 2009). Plaintiff acknowledges that his work at Northwest Masonry was "performed above the level of presumptive [SGA]," given that his average monthly earnings totaled approximately $2,583. (Doc. 17, at 2 n.4.) *See Robinson v. Astrue*, 641 F. Supp. 2d 689, 697 (N.D. Ill. 2009) (citing 20 C.F.R. § 404.1574(b)) (claimant's work was well in excess of that required to be presumptively SGA where he made average monthly earnings of

$1,374).  Plaintiff argues, however, that the ALJ failed to consider whether that work was performed in a "sheltered workshop environment."  20 C.F.R. § 404.1574(a)(3).

The problem for Plaintiff is that there is no evidence to support such a finding.  As noted, Plaintiff has not identified a single accommodation that Mr. Thompson purportedly made for his IBS.  In addition, the VE reviewed the record and heard Plaintiff describe his work for Mr. Thompson, but he did not indicate that the job was performed in a sheltered environment.  Plaintiff's cursory argument to the contrary is inadequate to overturn the ALJ's decision.  *See Elliott v. Astrue*, No. 1:09-CV-653-SEB-DML, 2010 WL 3893801, at *6 (S.D. Ind. Sept. 29, 2010) ("[P]erfunctory statements, unsupported by legal and factual development are forfeited.")  The ALJ's conclusion that Plaintiff's work for Mr. Thompson constituted SGA is supported by substantial evidence and is affirmed.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 16] is denied and Defendant's Motion for Summary Judgment [Doc. 24-3] is granted.  The Clerk is directed to enter judgment in favor of Defendant.


ENTER:

Dated: December 16, 2010

_Sheila Finnegan_

SHEILA FINNEGAN
United States Magistrate Judge